# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| DUBLINER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:23-cv-10567-RGS |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| EAST COAST TAVERN GROUP, INC. | ) | |
| and INISHOWEN, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS EAST COAST TAVERN GROUP, INC. AND INISHOWEN, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT



By their attorneys,


Benjamin M. Stern (BBO# 646778)
bstern@nutter.com
Patrick J. Concannon (BBO# 643673)
pconcannon@nutter.com
Maya Ginga Ritchie (BBO# 705397)
mgritchie@nutter.com
Nutter McClennen & Fish, LLP
Seaport West, 155 Seaport Blvd.
Boston, MA 02210
Telephone:(617) 439-2000
Facsimile: (617) 310-9000

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................................ 1

II.  BACKGROUND ............................................................................................................... 2

    A.  Facts ........................................................................................................................... 2

    B.  Expert Discovery ....................................................................................................... 2

III.  ARGUMENT .................................................................................................................... 3

    A.  Plaintiff Has the Burden to Prove a "Substantial Likelihood of Confusion" .................... 3

    B.  Plaintiff Has Not—and Cannot—Adduce Undisputed Facts That ECTG Infringes the
        Dubliner Marks .......................................................................................................... 3

    C.  The Numerous Factual Disputes for Each of the *Pignons* Factors Preclude Summary
        Judgment as to Inishowen ........................................................................................... 4

        1.  Whether the Parties' Marks are "Similar" Is Factually Disputed ................................. 4

        2.  There Are Factual Disputes as to the Similarity of the Goods ..................................... 5

        3.  There Are Factual Disputes As To The Plaintiff's and Inishowen's Channels of
           Trade, Relationship Between Their Advertising, and Classes of Prospective
           Purchasers ........................................................................................................... 6

           a.  There are Factual Disputes as to Channels of Trade .............................................. 9

           b.  There Are Factual Disputes as to Advertising ...................................................... 12

           c.  There are Factual Disputes as to Classes of Purchasers ........................................ 14

        4.  There Are Factual Disputes as to Plaintiff's (Alleged) Evidence of "Actual
           Confusion" .......................................................................................................... 15

        5.  There are Factual Disputes as to Intent ................................................................... 17

        6.  There are Factual Disputes as to the Strength of the Dubliner Marks ........................ 19

IV.  CONCLUSION ................................................................................................................ 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*,
   718 F.2d 1201 (1st Cir. 1983).................................................................................9, 12

*Attrezzi, LLC v. Maytag Corp*,
   436 F.3d 32 (1st Cir. 2006)............................................................................................19

*Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*,
   376 F.3d 8 (1st Cir. 2004).................................................................................................3

*Bear Republic Brewing Co. v. Cent. City Brewing Co.*,
   716 F. Supp. 2d 134 (D. Mass. 2010) ............................................................................3

*Borinquen Biscuit Corp. v. M.V. Trading Corp.*,
   443 F.3d 112 (1st Cir. 2006).............................................................................................3

*Bos. Duck Tours, LP v. Super Duck Tours, LLC*,
   531 F.3d 1 (1st Cir. 2008)........................................................................................15, 17

*Boston Rest. Assoc., Inc. v. Ward*,
   Civ.A.No. 17-5557, 2018 WL 5456669 (E.D.N.Y. Aug. 1, 2018)............................8

*Brennan's Inc. v. Brennan's Rest. LLC*, 360 F.3d at 134-35 (2d Cir.).........................8, 11, 12, 13

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
   174 F.3d 1036 (9th Cir. 1999) .........................................................................................8

*Buca, Inc. v. Gambucci's, Inc.*,
   18 F.Supp.2d 1193 (D. Kan. 1998)................................................................................9

*Capitol Fed. Sav. Bank v. E. Bank Corp.*,
   No. Civ.A.No. 07-11342-RCL, 2007 WL 7309743 (D. Mass. Dec. 3, 2007).....................7, 12

*CCBN.com, Inc. v. c-call.com, Inc.*,
   73 F. Supp. 2d 106 (D. Mass. 1999) ............................................................................12

*Channing Bete Co., Inc. v. Greenberg*,
   Civ.A.No. 19-30032, 2021 WL 4691597 (D. Mass. July 12, 2021)......................15

*Cheddar Bob's Inc., v. Macsnmelts, Mgt. Co.*,
   Civ.A.No. 16-1331, 2020 WL 132308 (E.D.N.Y. Jan. 14, 2020) ...........................8

*Comidas Exquisitos, Inc. v. O'Malley & McGees, Inc.*,
   775 F.2d 260 (8th Cir. 1985) ...........................................................................................8

*Dawn Donut Co. v. Hart's Food Stores, Inc.*,
　267 F.2d 358 (2d Cir. 1959)...................................................................................................7

*DeCosta v. Viacom Int'l, Inc.*,
　981 F.2d 602 (1st Cir. 1992)...................................................................................................3

*Dorpan, S.L. v. Hotel Melia, Inc.*,
　728 F.3d 55 (1st Cir. 2013)....................................................................................................3

*Dos Gringos, Inc. v. Chronic Tacos, Inc,.*
　Civ.A.No. 07-900, 2008 WL 11334495 (C.D. Cal. 2008)...............................................8, 20

*Granite State Trade Sch., LLC v. The N.H. Sch. of Mech. Trades, Inc.*,
　120 F. Supp. 3d 56 (D. N.H. 2015).......................................................................................16

*Hasbro, Inc. v. Clue Computing, Inc.*,
　66 F. Supp. 2d 117 (D. Mass. 1999), *aff'd*, 232 F.3d 1 (1st Cir. 2000)..................................15

*Infinity Broad. Corp., v. Greater Bos. Radio, II, Inc.*,
　Civ.A.No. 93-11161, 1993 WL 343679 (D. Mass. Aug. 18, 1993).......................................15

*Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Crédito Oriental*,
　852 F.3d 15 (1st Cir. 2016)................................................................................................3, 4

*Pa. State Univ. v. Vintage Brand, LLC*,
　715 F. Supp. 3d 602 (M.D. Pa. 2024)...................................................................................17

*Peoples Fed. Sav. Bank v. People's Bank*,
　672 F.3d 1 (1st Cir. 2012)....................................................................................................20

*Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*,
　657 F.2d 482 (1st Cir. 1981)............................................................................................. *passim*

*Plixer Int'l, Inc. v. Scrutinizer GmbH*,
　Civ.A.No. 2:16-CV-578, 2020 WL 2114923 (D. Me. May 4, 2020).......................................9

*Polar Corp. v. PepsiCo., Inc.*,
　789 F. Supp. 2d 219 (D. Mass 2011)....................................................................................20

*Pub. Impact, LLC v. Bos. Consulting Grp., Inc.*,
　169 F.Supp.3d 278 (2016)....................................................................................................20

*Pump, Inc. v. Collins Mgmt., Inc.*,
　746 F. Supp. 1159 (D. Mass. 1990)......................................................................................15

*Riverbank, Inc. v. River Bank*,
　625 F.Supp. 2d 73-74 (D. Mass. 2009).................................................................................15

*Russell Road Food and Beverage, LLC v. Spencer*,
    Civ.A.No. 12-01514, 2013 WL 321666 (D. Nev. Jan 28, 2013)................................................9

*Solmetex v. Dentalez, Inc.*,
    150 F. Supp. 3d 100 (D. Mass. 2015) ...................................................................................15

*Tana v. Dantanna's*,
    611 F.3d 767 (11th Cir. 2010) .................................................................................................8

*U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
    121 F.4th 339 (1st Cir. 2024).......................................................................................3, 9, 12

*Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc.*,
    828 F.Supp.2d 384 (D. Mass. 2010) ....................................................................................18

*Volkswagenwerk Aktiengesellschaft v. Wheeler*,
    814 F.2d 812 (1st Cir. 1987)...................................................................................................4

*Vraiment Hospitality, LLC v. Binkowski*,
    Civ.A.No. 11-1240, 2012 WL 1493737 (M.D. Fla. Mar. 19, 2012).........................................8

**Statutes**

L.R. 56.1 ..................................................................................................................... *passim*

## I.    INTRODUCTION

Plaintiff's summary judgment motion, and its accompanying L.R. 56.1 Statement, underscores why it is not entitled to summary judgment: the record is replete with factual disputes.  For example, the Court need look no further than the opposing opinions of Defendants' survey expert (Brian Sowers) and Plaintiff's untimely and sandbagging survey expert (David Franklyn).[1]  Mr. Sowers has offered the opinion that there is no "likelihood of confusion" between Plaintiff's Dubliner Marks[2] and Defendant Inishowen, Inc.'s ("Inishowen") "The Dubliner" establishment located at 2 Center Plaza in Boston, Massachusetts ("Dubliner Boston").  Only in connection with summary judgment did Plaintiff submit Mr. Franklyn's expert report that describes the (alleged) flaws in Mr. Sowers' report, and offers his own (flawed) survey.  Even if the Court does not strike Mr. Franklyn's report,[3] there are many genuine factual (and expert) disputes on the central issue—likelihood of confusion.

There is also substantial evidence (including as determined by the U.S. Patent Office and Trademark Office) that Plaintiff's Dubliner Marks are "relatively weak" because "it is not unusual for the term Dubliner to be associated with restaurants, bars and food…," and that "the term 'Dubliner'…is highly suggestive of goods and restaurant services that either originate in Ireland or have an Irish theme."  It is therefore unsurprising that there are (or were) ***over 30 other "Dubliner" Irish restaurants and bars across the country***, including several in Massachusetts and ones closer geographically to Plaintiff's establishment in Washington, D.C. ("Dubliner DC") than Dubliner DC is to Dubliner Boston.  All these other "Dubliner" establishments peacefully

---

[1] Plaintiff filed a motion to exclude Defendants' non-survey expert, Doug Bania.  Defendants' opposition to that motion is concurrently filed herewith.

[2] "Dubliner" Marks refers to marks identified in the First Amended Complaint.  Dkt. No. 6 at ¶ 24.

[3] Contemporaneously herewith, Defendants are filing a motion to strike materials Plaintiff filed in connection with its summary judgment motion, including Mr. Franklyn's expert report.

co-existed with Dubliner DC for years, and (despite knowing about them for a long time)

Plaintiff has done nothing about them.  Plaintiff may disagree with this evidence, but it concedes

(as it must) that it is a "relevant consideration" in evaluating likelihood of confusion.  Pl. Br. at

19.  In other words, the factfinder must evaluate that evidence in determining whether Plaintiff

can meet its burden to prove likelihood of confusion, thereby precluding summary judgment.

That same pattern repeats itself throughout the record.  There are innumerable other

factual disputes underlying each of the eight *Pignons* factors—the framework by which the

factfinder analyzes likelihood of confusion.  That is why the First Circuit instructs that because

"likelihood of confusion analysis is a particularly fact-intensive one, resolving this issue on

summary judgment is disfavored."  Plaintiff's chest-thumping claim that "this is not a close

case" does not square with the record.  What is "not close" is the presence of a large number of

genuine and material factual disputes, each of which require denial of Plaintiff's motion.

## II.    BACKGROUND

### A.    Facts

Plaintiff's L.R. 56.1 Statement (Dkt. No. 86) is riddled with factual disputes.

Defendants' L.R. 56.1 Statement, which disputes many of Plaintiff's facts ("R-SMF") and adds

additional undisputed material facts ("D-SAMF"), is filed concurrently herewith and

incorporated by reference herein.

### B.    Expert Discovery

As the party bearing the burden of proof on likelihood of confusion, Plaintiff served two

"opening" expert reports, one from Dr. Lilly Jan and the other from W. Todd Schoettelkotte on

February 3, 2025.[4]  D-SAMF 18.  Defendants timely served two rebuttal expert reports, one from

---

[4] At the outset of the case, the parties proposed (and the Court adopted) a schedule with two rounds of
expert reports—opening reports "from the party bearing the burden of proof on a particular issue," and "rebuttal"

Mr. Sowers and one from Doug Bania.  D-SAMF 1-17.  Attached to its motion for summary judgment, Plaintiff disclosed—for the first time—an "expert report"[5] from Mr. Franklyn, in which he describes and opines on his own survey as to likelihood of confusion.

## III.    ARGUMENT

### A.    Plaintiff Has the Burden to Prove a "Substantial Likelihood of Confusion"

In the First Circuit, courts (and factfinders) use the *Pignons* factors to evaluate trademark infringement.  Each *Pignons* factor is a question of fact.  *See, e.g., Dorpan, S.L. v. Hotel Melia, Inc*., 728 F.3d 55, 64 (1st Cir. 2013).  No single factor is dispositive and even if a majority of *Pignons* factors weigh in its favor, that party does not automatically prevail.  *See Borinquen Biscuit Corp. v. M.V. Trading Corp*., 443 F.3d 112, 120 (1st Cir. 2006); *Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Crédito Oriental*, 852 F.3d 15, 32 (1st Cir. 2016).

Plaintiff has the burden of proof on each *Pignons* factor.[6]  *Pignons S.A. de Mecanique de Precision v. Polaroid Corp*., 657 F.2d 482, 492 (1st Cir. 1981).  That burden is heavy; Plaintiff must prove a "substantial likelihood of confusion."  *See Bear Republic Brewing Co. v. Cent. City Brewing Co*., 716 F. Supp. 2d 134, 140 (D. Mass. 2010); *Dorpan*, 728 F.3d at 66; *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 14 (1st Cir. 2004); *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 348 (1st Cir. 2024).  That fact-intensive burden is very difficult to meet at summary judgment.  *See, e.g., Dorpan*, 728 F.3d at 66.

### B.    Plaintiff Has Not—and Cannot—Adduce Undisputed Facts That ECTG Infringes the Dubliner Marks

---

reports from the other party on that issue.  *See* Dkt. No. 19 at 9; Dkt. No. 27 at 2.  This agreement—and this sequencing—has remained consistent throughout this case.  *See* Dkt. No. 49 at 3-4; Dkt. No 50; Dkt. No. 51 at 3; Dkt. No 52; Dkt. No. 53 at 1; Dkt. No. 54 at 1; Dkt. No. 55 at 3; Dkt. No. 59 at 1; Dkt. No. 70; Dkt. No. 71.

[5] *See* Dkt. No. 61 at ¶ 8 ("*Expert Report* of David Franklyn") (emphasis added); Dkt. No. 85 at 16 (same).

[6] Plaintiff (Pl. Br. at 7) suggests that ownership of a trademark registration means it has met burden to prove trademark infringement, i.e., likelihood of confusion.  It does not.  *See, e.g., DeCosta v. Viacom Int'l, Inc.,* 981 F.2d 602, 606 (1st Cir. 1992).

Plaintiff lumps the defendants—East Coast Tavern Group, Inc. ("ECTG") and Inishowen—together and alleges they infringe the Dubliner Marks by *jointly* owning or operating Dubliner Boston, or using DUBLINER marks in commerce.  That is incorrect.  There is substantial evidence that ECTG plays no role in the ownership, operation, or management of Dubliner Boston, nor does it otherwise use any DUBLINER mark in commerce.  *See, e.g.*, R-SMF 8, 15, 24-29, 32-39, 47-49, 60-63, 65, 67, 69-71.  ECTG therefore cannot be found liable for infringing the Dubliner Marks.  Plaintiff's motion should be denied on this basis alone.

**C.      The Numerous Factual Disputes for Each of the *Pignons* Factors Preclude Summary Judgment as to Inishowen**

Virtually every material fact as to each of the *Pignons* factors (individually and collectively) is disputed, warranting denial of Plaintiff's motion for summary judgment.

**1.      Whether the Parties' Marks are "Similar" Is Factually Disputed**

The first *Pignons* factor is whether, as used in commerce, Dubliner Boston and Plaintiff's use of their respective marks are "substantially similar."  *See, e.g.*, *Oriental*, <u>832 F.3d at 34</u> & n.24.  The factfinder should consider the marks as a whole, rather than individual components.  *See, e.g., Volkswagenwerk Aktiengesellschaft v. Wheeler*, <u>814 F.2d 812, 817</u> (1st Ci<u>r. 1987</u>).

The attached chart illustrates differences between representative logo and wordmarks, as used in commerce, by Plaintiff (and its licensees) on the one hand and Dubliner Boston on the other.  *See* Ex. A.  As that chart makes clear, Dubliner DC's logo has a semi-circular emblem with a custom Celtic-inspired design of two crouching people raising drinks to their mouths amid knots and interwoven graphical elements typical of Celtic art, and with Celtic lettering that has "the" smaller than "dubliner" and "an irish pub," (sometimes also with "washington, d.c.").  D-SAMF 24-29.  Dubliner Boston does not use this logo.  D-SAMF 26-28.  Dubliner DC's wordmarks all use Celtic-inspired lettering and are all lowercase.  D-SAMF 24.  In contrast,

4

Dubliner Boston's logos are oval or rectangular, contain a harp graphic, use modern lettering (similar to newspaper style) with initial (or all) capital letters, and variously include "Boston," Boston, MA," or "EST 2022."  D-SAMF 23.  Its wordmarks use same (or similar) modern font and capitalization.  *Id*.[7]

Plaintiff and its (alleged) licensee's AULD DUBLINER beer marks (featuring Dubliner DC's logo and Celtic lettering, as shown in Ex. A) and its licensee's Dubliner Whiskey marks (using Celtic lettering or "DUBLINER" in vertical block font) create different commercial impressions than Dubliner Boston's marks.  *See* R-SMF 19; D-SAMF 17(b), 30; *see also* Ex. A. Inishowen does not use any AULD DUBLINER mark.  Plaintiff claims that "Dubliner" (without "Auld") is sufficient for infringement.  Pl. Br. at 9.  This essentially collapses Plaintiff's AULD DUBLINER into its "Dubliner"-only marks.  At minimum, a factfinder must evaluate this.[8]

### 2.    There Are Factual Disputes as to the Similarity of the Goods

Likewise, there are, at minimum, factual disputes as to the similarity of the goods and services.  Although, in a general sense, Dubliner DC and Dubliner Boston both offer Irish-themed restaurant and bar services, there are important differences in their offerings that lead to different meaningful differences.  Dubliner DC's food offerings are traditional Irish food or are what most Americans would expect in an Irish pub.  R-SMF 23.  Its beverage selections focus on Irish whiskey and Guinness® beer.  *Id*.  Nor does Dubliner DC's food or beverage menu change much.  *Id*.  In contrast, Dubliner Boston offers both "traditional" and "modern" Irish food.  R-SMF 35-36; D-SMAF 17(b); *see also* Bania Rpt. ¶¶ 40-45.  Dubliner Boston differentiates itself

---

[7] The décor of Dubliner DC and Dubliner Boston are also very different.  D-SAMF 21-24.

[8] The expert report of Defendants' expert, Mr. Bania (the "Bania Rpt.") is attached as Ex. 34 to the Declaration of Benjamin M. Stern (which is attached as Ex. A to Defendants' L.R. 56.1 Statement), all concurrently filed herewith.  In it, Mr. Bania presents facts that show that the "different fonts, colors, imagery, and location references" incorporated into the logos and word marks, as well as website addresses, for Dubliner DC and Dubliner Boston, "distinguish" the two establishments.  D-SAMF 17(a); Bania Rpt., ¶¶ 33-39.

from "traditional" Irish pubs in the U.S. (which include Dubliner DC) by having ever-changing menus that go well beyond American stereotypes as to what "Irish" food is. *Id.* Dubliner Boston also offers "signature cocktails" that are different than "traditional" drinks for an Irish pub. *Id.* So too with the live music: Dubliner DC only has "regulars" that perform traditional Irish music, but Dubliner Boston brings acts in from Ireland (and all over the U.S.). *Id.* Despite Plaintiff's attempt to sweep these differences away, they create factual disputes.[9]

Several of the Dubliner Marks are limited to "beer or ale" (Class 32) or "distilled spirits; liqueurs; spirits; whiskey" (Class 33). SMF 11. Inishowen does not sell such goods under any DUBLINER mark (or otherwise), nor does Plaintiff contend it does. *See, e.g.,* R-SMF 15; Bania Rpt., ¶ 42. Rather, Plaintiff argues that Inishowen infringes those Dubliner Marks because Dubliner Boston serves whiskey/spirits and beer/ale to patrons. Pl. Mem. at 8-9 (citing out-of-circuit cases). But, whiskey, beer, and ale—sold as bottled goods—are not, as a matter of undisputed fact or law "highly related" to Inishowen's bar/restaurant services, especially given the branding differences and the "weakness" of Plaintiff's Dubliner Marks. *See* Sections III.C.1, 3, 6; *see also* R-SMF 22.

Mr. Bania, in his expert report, provides explanation and analysis of the facts underlying this *Pignons* factor, which (at best) create additional factual disputes. *See* D-SAMF 17(b); Bania Rpt., ¶¶ 40-45, Sch. 5.

### 3.    There Are Factual Disputes As To The Plaintiff's and Inishowen's Channels of Trade, Relationship Between Their Advertising, and Classes of Prospective Purchasers

As Plaintiff observed, *Pignons* factor #3 (channels of trade), #4 (advertising), and #5

---

[9] Plaintiff bases its argument on Dubliner DC and Dubliner Boston both selling apparel and gift cards. Pl. Br. at 8. Online sales of these items represents ██████ of the parties' total sales. D-SMAF 17(c). These goods are, at best, *de minimis*. Further, all such items contain the parties' respective logos. Bania Rpt., ¶¶ 44, 50.

(classes of prospective purchasers) "are often considered together because they tend to be interrelated."  Pl. Br. at 10.  There are numerous factual disputes across each of these factors. For example, where, as here, parties have different geographic channels of trade and target different classes of purchasers in different geographic areas (and use different advertising to do so), courts have declined to find a likelihood of confusion.  *See, e.g.*, *Capitol Fed. Sav. Bank v. E. Bank Corp.*, No. Civ.A.No. 07-11342-RCL, 2007 WL 7309743, at *17 (D. Mass. Dec. 3, 2007) (denying preliminary injunction because the "banks do not target the same area…even considering the banks' internet presence and advertising").

Courts often invoke the "Dawn Donut Rule"[10] in cases like this one to find that there is no likelihood of confusion where the junior user (Dubliner Boston) operates in a different geographic area (Boston) from the senior user (here, Dubliner DC), when the senior user has no "concrete plans" to enter that other market.  *See id.*  In a factually analogous case to this one (two restaurants in different geographies), the Second Circuit held that:

> [G]eographic remoteness is critical in this case.  In the restaurant industry, especially where individual restaurants rather than chains are competing, physical separation seems particularly significant to the inquiry into consumer confusion. Even in this age of rapid communication and travel, plaintiff faces a high hurdle to demonstrate that a single restaurant in New Orleans and a single restaurant in New York City compete for the same customers.  That is particularly the case here where the dining services require a customer's physical presence and cannot rely, for instance, on Internet or mail-order sales.

*Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 134-35 (2d Cir. 2004) (affirming district court, "even crediting plaintiff's contention that over seven percent of its business comes

---

[10] This venerable "rule" stems from 1959 case *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959), which limits ability of a trademark registrant to enforce its rights in a geographic area where another party is using the same or similar mark.  The rule essentially prevents a senior trademark registrant from enforcing its rights against a junior user in a geographic area where the senior user has not actually used the mark or expanded. *See, e.g.*, *Capitol Fed.*, 2007 WL 7309743, at *17 & n.41 (citing *Dawn Donut* and finding no overlap between parties' advertising and trade because plaintiff "does not have a concrete plan" to enter Massachusetts).

from New York State").  Other circuits agree.  *See, e.g.*, *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999) (noting that courts have permitted concurrent use of the same mark by restaurants in different states); *Comidas Exquisitos, Inc. v. O'Malley & McGees, Inc.*, 775 F.2d 260 (8th Cir. 1985) (affirming dismissal of trademark infringement claim based on "geographic separation" of the parties' restaurants (Iowa and Georgia) and absent evidence plaintiff took concrete steps to expand into the other defendant's "geographically distinct" market); *cf. Tana v. Dantanna's*, 611 F.3d 767, 777 (11th Cir. 2010).

District courts similarly concluded that restaurants' different geographies can, as a factual matter, vitiate likelihood of confusion.  *See, e.g., Boston Rest. Assoc., Inc. v. Ward*, Civ.A.No. 17-5557, 2018 WL 5456669, at *4 (E.D.N.Y. Aug. 1, 2018) ("[I]t seems unlikely that the typical customer entering or passing by defendants' Flushing, New York location would confuse 'Regina's' and 'Regina Cafe Pizzeria' with plaintiff's Massachusetts and Connecticut locations, products, or services…this factor weighs against finding a likelihood of confusion"); *Dos Gringos, Inc. v. Chronic Tacos, Inc,*. Civ.A.No. 07-900, 2008 WL 11334495, at *1, 4 (C.D. Cal. 2008) (finding that "geographical distance" between restaurants in Arizona and California, combined with "widespread use" of the mark throughout the U.S., demonstrated no likelihood of confusion; plaintiff's claims that it was "evaluating the feasibility" of opening a location in California were not concrete actions to expand).[11]

---

[11] *See also, e.g., Cheddar Bob's Inc., v. Macsnmelts, Mgt. Co.,* Civ.A.No. 16-1331, 2020 WL 132308, at *10 (E.D.N.Y. Jan. 14, 2020) ("While Cheddar Bob's has presented evidence that it is possible that a consumer may mistake its New York restaurant with defendants' restaurant in Ohio by searching online, the record is devoid of evidence suggesting that an appreciable number of consumers would make this mistake"); *Vraiment Hospitality, LLC v. Binkowski*, Civ.A.No. 11-1240, 2012 WL 1493737, at *9 (M.D. Fla. Mar. 19, 2012) (finding the geographic distance between restaurants in North Carolina and Florida, which are "separate markets," was "the key factor" that "substantially undermines the likelihood of customer confusion"); *Buca, Inc. v. Gambucci's, Inc*., 18 F.Supp.2d 1193, 1210 (D. Kan. 1998) ("Because the two [restaurants] operate in separate markets...the likelihood of confusion is slight."); *Russell Road Food and Beverage, LLC v. Spencer*, Civ.A.No. 12-01514, 2013 WL 321666, at * 3 (D. Nev. Jan 28, 2013) (denying preliminary injunction because the "geographic separation" of two "strip clubs" using the CRAZY HORSE mark as their name was "especially important" in evaluating marks for services (as opposed to

So too here.  Dubliner DC and Dubliner Boston are in entirely different geographies and Plaintiff—despite its attempts at misdirection—has failed to prove (at least undisputedly) it has "concrete plans" to open a Dubliner DC location in Boston.  *See* R-SMAF 5-10, 12-14, 21, 31-34, 37-38; D-SAMF 14-15, 17(c)-(e); Bania Rpt., ¶¶ 21-29.  Similarly, Inishowen does not have any intention of expanding Dubliner Boston to any other location or geography.  D-SMAF 21.

a.        *There are Factual Disputes as to Channels of Trade*

"Channels of trade refer to the distribution methods and markets in which the products are sold."  *Plixer Int'l, Inc. v. Scrutinizer GmbH*, Civ.A.No. 2:16-CV-578, 2020 WL 2114923, at 5 (D. Me. May 4, 2020).  Plaintiff's claim that both Dubliner DC and Dubliner Boston offer food and bar services (in different geographies) is not dispositive; the fact that both pubs "operate in the same broad economic sector proves very little."  *U.S. Ghost Adventures*, 121 F. 4th at 19; *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc*., 718 F.2d 1201, 1206 (1st Cir. 1983).

Dubliner DC and Dubliner Boston's channels of trade are different.  Although both, as a general matter, offer Irish-themed restaurant and bar services, they only do so in their separate geographies—Dubliner DC at a single location in Washington. D.C. and Dubliner Boston at a single location in Boston.  Dubliner DC does not "concern itself" with actual or potential customers outside the Washington, D.C. area.  R-SMF 5, 21; D-SMAF 17(e).  Nor does it seek to attract customers who live or work outside the Washington, D.C. area.  *See, e.g.*, *id.*; R-SMF 6-7, 12-14, 21, 31-34, 37-38; D-SAMF 15.  In contrast, Dubliner Boston's channels of trade target customers are people who live or work in immediate vicinity of its single location (in Boston), who are college students in the Boston area, or who are from Ireland but who live in the Boston

---

goods) and because plaintiff failed to adduce any evidence of concrete steps to expand to other geography).

area.  R-SMF 24, 34, 38; D-SMAF 17(d).[12]  Unlike Dubliner DC, Dubliner Boston is *not* a "tourist oriented business."  *Id*.  This is borne out in the metrics for, at least, Dubliner Boston's website:  66% of visitors to the website were from Massachusetts, while only 1% were from Washington, D.C.  *See, e.g.*, Bania Rpt. ¶ 49.

It follows that Dubliner Boston and Dubliner DC do not cater to the same type of consumer.  Plaintiff claims—without any evidentiary support—that "there is nothing in the record to indicate a high level of consumer sophistication among the broad categories of relevant consumers."  Pl. Br. at 12.  It also contends that both Dubliner DC and Dubliner Boston's consumers "consist of anyone who would consider an Irish restaurant or pub or Irish whiskey." *Id*.  But, while Dubliner DC's customers may simply be looking (in the Washington, D.C. area) for "traditional" Irish food and drinks, Dubliner Boston takes great pains to offer (and does offer) "modern" Irish cuisine, specialty cocktails, and changing live music performances at its single Boston location.  R-SMF 23, 35-37.  Dubliner Boston (unlike Dubliner DC) is much more than a "traditional Irish pub." *Id*.

Plaintiff claims that there is "no question" as to "consumer overlap" with Dubliner Boston and Dubliner Whiskey.[13]  Pl. Br. at 11.  Dubliner Whiskey is ***not*** sold at Dubliner Boston, whether in cocktail or bottle form (and it does not sell bottled whiskey at all).  R-SMF 15. Plaintiff has no factual basis to suggest the "class of consumers" who go to Dubliner Boston to have whiskey "as a drink or cocktail" is the same class of consumers who would buy a bottle of Dubliner Whiskey.  R-SMF 14.[14]  Plaintiff's other arguments are red herrings.  That Dubliner

---

[12] Plaintiff's suggestion that Dubliner Boston's "door is open to anyone" is misleading.  Pl. Br. at 10.  That Dubliner Boston (and presumably Dubliner DC) will not turn away a patron does not equate to having channels of trade, marketing, and classes of prospective customers that include whatever Plaintiff says it does.

[13] Plaintiff omits mention of its (alleged oral) license for Auld Dubliner Amber Ale.  R-SMF 19.

[14] Plaintiff's suggestion that, because Dubliner Whiskey is marketed and sold in in Massachusetts there is likelihood of confusion with Dubliner Boston collapses upon itself.  Dubliner Whiskey's marketing and promotional

10

Boston is listed as a Pittsburgh Steelers "watch bar" (by unknown third parties) and Dubliner Whiskey has a collaboration with the Steelers does not prove, as a matter of law, that this class of consumers (Boston-based Steelers fans) overlap. R-SMF 16-17. Nor does Plaintiff's incorrect assertion that Dubliner Boston "featured" Dubliner Whiskey on one TikTok post (that is not publicly viewable). R-SMF 15.

Plaintiff also spills much ink claiming that Dubliner DC and Boston's consumers overlap because of a "high-level of inter-relatedness between Boston and Washington, D.C.," suggesting that business or pleasure travel between the two cities is somehow relevant. Pl. Br. at 11. It is not. *See, e.g.*, *Brennan's*, 360 F.3d at 134-35. Regardless, Plaintiff has failed to adduce even one non-speculative example of a customer taking an Amtrak train from Boston to Washington, D.C. and going to Dubliner DC (or vice versa). *See* Bania Rpt., ¶ 48. Nor is there any evidence of any consumer visiting Dubliner DC's physical location or website, thinking it was Dubliner Boston (or vice versa). *Id.* at ¶ 51. Instead, Plaintiff's "evidence" consists of general statements (attributed to Plaintiff's experts) about travel between the two cities. Pl. Br. at 10-11. But Plaintiff's general statements about travel between Washington, D.C. and Boston are equally applicable to D.C. and any number of U.S. cities—including those with "Dubliner" Irish pubs. *See* Section III.C.6, *infra*. Therefore none of this dispels any genuine issues of material fact underlying these *Pignons* factors. D-SAMF 17(c), (f); Bania Rpt., ¶¶ 46-48.

Further, Mr. Sowers conducted a survey of people intending to travel to Boston. He found that there is no likelihood of confusion between Plaintiff's Dubliner Marks and Dubliner

---

activities are the same throughout the U.S. R-SMF 14, 16. The logical conclusion of Plaintiff's argument is that it should enforce its marks against any "Dubliner" establishment, simply because Dubliner Whiskey is also sold in that state. It has not done so.

11

Boston and its marks in that group.[15]  *See* D-SMAF 1-10; Sowers Rpt., ¶¶ 18, 106-169.[16]

At best, the record is undisputed only insofar as the Dubliner DC and Dubliner Boston both provide restaurant and bar services, live music, and (in a *de minimis* volume) sell apparel and gift cards—in their respective geographies.  But that "broad inference" does not put to rest the numerous genuine issues of material fact.  *See* U.S. *Ghost Adventures*, 121 F. 4th at 19; *Astra Pharm. Prods.*, 718 F.2d at 1206; *Brennan's*, 360 F.3d at 134-35; *see also CCBN.com, Inc. v. c-call.com, Inc.*, 73 F. Supp. 2d 106, 113 (D. Mass. 1999) ("de minims confusion, which is easily resolved, and does not affect the ultimate purchase decision, is of minimal relevance") (internal citation omitted).

b.        *There Are Factual Disputes as to Advertising*

Because the internet is widely used for advertising, the fact that "the goods or services of the parties are both found on the internet proves little, if anything, about the likelihood that consumers will confuse similar marks used on such goods or services."[17]  4 McCarthy On Trademarks And Unfair Competition § 24:53.50 (4th ed. 2004); *see also Capitol Fed.*, 2007 WL 7309743, at *17; *Brennan's*, 360 F.3d at 134-35.  That Dubliner DC and Dubliner Boston have websites and use social media does not meet Plaintiff's burden.[18]  *Id.*

---

[15] Plaintiff suggests that Mr. Sowers' report should have been an "affirmative" expert report.  Pl. Br. 17.  Not so.  Defendants did not have the burden of proof on that issue.  *See, e.g.,* Dkt. No. 70; Dkt. No. 76.

[16] Mr. Sowers' expert report ("Sowers Rpt.") is attached as Ex. 33 to the Declaration of Benjamin M. Stern (which is attached as Ex. A to Defendants' L.R. 56.1 Statement).  Mr. Sowers conducted a survey of consumers who live or work in "the Boston area" and concluded that there is no likelihood of confusion between Plaintiff's Dubliner Marks and Dubliner Boston.  *See, e.g.,* D-SAMF 4-10; Sowers Rpt., ¶¶ 18, 104-05, 168.

[17] Plaintiff misleadingly suggests that having an online presence (website and social media), and getting mentioned in local press that also have websites, equates to "advertis[ing] nationally."  Pl. Br. at 12.  Even if true (see *supra*) it does not demonstrate that an "appreciable number" of consumers actually viewed the other's materials.  Plaintiff's argument also undercuts its claim that its Dubliner Marks are strong; other "Dubliner" Irish pubs and restaurants likewise have websites, use social media, and are mentioned in local press. *See* i*nfra*; *see also* Bania Rpt., ¶¶ 56-57 & Sch. 4.

[18] Dubliner DC and Dubliner Boston's uses are different.  Dubliner DC's website is www.dubliner*dc*.com" but Dubliner Boston's is www.*the*dubliner*boston*.com.  Pl. Br. at 11 (emphases added); R-SMF 5, 34-37.  Social

The evidence shows that Dubliner DC and Dubliner Boston's advertising are targeted toward people who are physically located in the Washington, D.C. or Boston areas (respectively). *See, e.g.,* R-SMF 4-7, 21, 34, 38; D-SAMF 17(d)-(e); *see also* R-SMF 13; D-SAMF 15. Further, Dubliner Boston advertises using Google AdWords (to promote Google search results) but *only* for searches by users physically within a several mile radius of its location in Boston (at the time of the search). R-SMF 5, 34; D-SAMF 17(d), (e); *see also* Bania Rpt., ¶¶ 54-55. Even then, the "keywords" Dubliner Boston buys do not use "Dubliner" at all; it uses generic keywords for Irish bars. *Id.* Dubliner DC does not use Google AdWords at all. *Id.* In any event, neither Dubliner DC nor Dubliner Boston spend a significant amount of money on advertising. Bania Rpt., ¶ 52. Dubliner DC promotes its location (near Union Station and Capitol Hill in Washington, D.C.) as a benefit, but Dubliner Boston does not view (or market) its location as a benefit (and sees it as a drawback). R-SMF 38; Bania Rpt., ¶ 52. Further, the (mostly local) press mentions of Dubliner DC and Dubliner Boston were in different publications, at different times, and focus on the geographic location of the establishment (Washington, D.C. or Boston). Bania Rpt., ¶¶ 58-59; *see also* R-SMF 6. And, to the extent that Plaintiff knows how Dubliner Whiskey is advertised, it is mostly via tastings and store displays—none of which Inishowen does (it does not sell Dubliner Whiskey). R-SMF 14, 22.

In sum, the record as to advertising by Dubliner DC and Dubliner Boston is not as tidy (or as undisputed) as Plaintiff suggests. Although Dubliner DC and Dubliner Boston advertise via their own uniquely named websites and social media accounts, that they do not share a customer base and deliver their services through the same channels means that it is (at least) an issue of disputed fact whether a reasonable consumer would confuse Dubliner DC and Dubliner

---

media and online reservation platforms are different too. R-SMF 5, 8, 34; D-SAMF 17(d), 22; Bania Rpt., ¶¶ 56-57.

13

Boston.  Plaintiff cannot prove an absence of any genuine issue of material fact underlying this *Pignons* factor.  *See, e.g.,* Bania Rpt., ¶¶ 52-62.

> c.        *There are Factual Disputes as to Classes of Purchasers*

According to Plaintiff's experts, there is "overlap" between consumers between Dubliner DC and Dubliner Boston because Washington, D.C. and Boston have large populations with Irish heritage, are tourist destinations, and their establishments are in areas where government employees work.[19]  Bania Rpt., ¶ 63.  These general statements about the respective cities are irrelevant to whether, as a matter of fact, there are overlaps between customers patronizing Dubliner DC (or buying Dubliner Whiskey) and Dubliner Boston.  *Id*.

Because visitors to Dubliner DC and Dubliner Boston's websites can be an indication of potential customers for those establishments, one way to evaluate this issue is to use website analytics.  *Id*. at ¶ 64.  As he explains in his expert report, Mr. Bania performed an experiment to see what Google search results a consumer located in Washington, D.C. and one located in Boston would see if they entered "Dubliner" (or similar marks) into Google's internet search engine.  *Id*. at ¶ 65.  He found that such searchers in one city would not be directed to the establishment in the other city.  *Id.*  Additionally, as explained above, only 1% of the visitors to Dubliner Boston's website were located in Washington, D.C. (while 66% were from Massachusetts).  Moreover, Dubliner Boston only uses Google AdWords (none of which contain any "Dubliner" term) in the immediate vicinity of Dubliner Boston.  *Id*. at ¶¶ 54-55.  All of this raises genuine issues of material fact.[20]  *See also* Bania Rpt., ¶¶ 63-66.

---

[19] Plaintiff's argument that Dubliner Boston is frequented by state and federal government office workers appears to be based on a misunderstanding of what "Government Center" actually is.  Although that area includes Boston City Hall and a single federal office building, it is not (unlike Capitol Hill) dominated by government workers, nor does Dubliner Boston cater to them.  R-SMF 38.

[20] Plaintiff suggests that, because "lawmakers, organizations, and customers of all kinds" from Boston have been to Dubliner DC "countless times since it opened in 1974" somehow must mean that there are necessarily

### 4.    There Are Factual Disputes as to Plaintiff's (Alleged) Evidence of "Actual Confusion"

The next *Pignons* factor (#6) is evidence of actual confusion.  Plaintiff must be able to prove that "an appreciable number" of consumers were confused.  *See Bos. Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12 (1st Cir. 2008); *Riverbank, Inc. v. River Bank*, 625 F.Supp. 2d 73-74 (D. Mass. 2009).  It cannot do so (at least undisputedly).

Mistaken reservations for Dubliner Boston, instead of Dubliner DC (the majority of Plaintiff's "evidence"), are not sufficient. "Confusion resulting from the consuming public's carelessness, indifference, or ennui will not suffice to establish consumer confusion." *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F. Supp. 2d 117, 124 (D. Mass. 1999), *aff'd*, 232 F.3d 1 (1st Cir. 2000).[21]  Courts should look at the alleged instances in context.  *See, e.g., Channing Bete Co., Inc. v. Greenberg*, Civ.A.No. 19-30032, 2021 WL 4691597, at *5 (D. Mass. July 12, 2021) (isolated instances of "misunderstandings" was insufficient evidence of actual confusion) (citing and discussing cases).  Misidentification or carelessness that fails to result in confusion as to the source or origin of services is also insufficient.  *See, e.g., Infinity Broad. Corp., v. Greater Bos. Radio, II, Inc.*, Civ.A.No. 93-11161, 1993 WL 343679, at *11 (D. Mass. Aug. 18, 1993);  *Pump, Inc. v. Collins Mgmt., Inc.*, 746 F. Supp. 1159, 1162 (D. Mass. 1990); *see also Solmetex v. Dentalez, Inc.*, 150 F. Supp. 3d 100, 114-15 (D. Mass. 2015) (evidence consisting of screenshots could reflect "accidental data entry" and factfinder needed "explanation and context" to determine if consumers were actually confused); *Granite State Trade Sch., LLC v. The N.H. Sch.*

---

overlapping consumers with Dubliner Boston.  Pl. Br. at 10.  But there is no evidence that any of these customers ever went to (or would go to) Dubliner Boston, including because Dubliner Boston only opened in 2022.

[21] That businesses using similar names can cause consumers to take unintended online detours when searching for a particular business's website does not amount to "actual confusion."  *See, e.g., id.* at 125 ("I conclude that, although the need to search for Hasbro's site may rise to the level of inconvenience, it is not sufficient to raise a dispute as to actual confusion.  The paucity of evidence of reasonable and actual confusion weighs heavily against Hasbro's ability to show a likelihood of confusion").

*of Mech. Trades, Inc.*, 120 F. Supp. 3d 56, 65 (D. N.H. 2015) (consumers' carelessness in using internet is insufficient evidence of actual confusion).

Defendants have identified numerous factual disputes and evidentiary issues for every one of Plaintiff's alleged examples of "actual confusion."  R-SMF 8, 40-69, 71-72; *see also* Bania Rpt., ¶¶ 61, 68-74; Def. Motion to Strike (concurrently filed herewith).  These problems are fatal to granting summary judgment.  Even putting aside these deficiencies, Plaintiff has, at best, identified about 30 examples of "reservation confusion"[22] (which are the majority of its alleged instances of actual confusion) in the almost three years Dubliner Boston has been open.[23] There are (at least) genuine issues of material fact as to whether those instances—in the total context of Dubliner DC's reservations—are *de minimis*.[24]  Further, Plaintiff admits that, ***solely because of this litigation***, it began tracking instances of alleged confusion between Dubliner Boston and Dubliner DC—but that it does not do so for any of the former or current "Dubliner" establishments across the U.S.  R-SMF 42; D-SAMF 39-40.  This makes Plaintiff's cherry-picked evidence suspect.  It is a credibility issue, at least, for Plaintiff to claim, on the one hand, that alleged confusion with Dubliner Boston is prevalent, but that, on the other hand, it is unaware of any instance relating to any other past or current "Dubliner" establishment in the U.S. in the 50 years it has been open; this is certainly a jury issue.  In many (if not all) of

---

[22] Plaintiff's SMF 8, 40, 69, and 71-72 are littered with duplicative examples or vague as to details. *Compare, e.g.,* R-SMF 42 (l7 bulleted incidents), *with* SMF 43-50, 60-61, 64-66.

[23] The other alleged examples—a vendor and a real estate broker asking if Dubliner Boston and Dubliner DC are related, a single example of a private party inquiry, a few text messages, and a smattering of social media posts by unidentified third parties hardly meet Plaintiff's burden (even if Plaintiff could overcome the evidentiary problems).  *See* R-SMF 39, 59, 61-63, 71-72.

[24] For example, Plaintiff identified nine alleged instances between April 2023 and June 2024, which was the only time period for which it produced complete reservation data.  As Mr. Bania explains, those instances amount to 0.02% of the total reservations made at Dubliner DC during that period.  Bania Rpt., ¶ 70.  Despite Defendants' request, Plaintiff did not produce updated reservation data; it also stated that it failed to retain such data from prior to April 2023.  R-SMF 42, 48-58.

16

Plaintiff's "reservation confusion" instances, Dubliner DC accommodated the guests; none of any of the (alleged) "actual confusion" harmed Dubliner DC.[25]  *See, e.g.*, R-SMF 42; SMF 54, 57; Bania Rpt., ¶¶ 75-76.

Plaintiff also has no response to Mr. Sowers.  As he explained, surveys are "the usual and accepted method in admitting expert testimony on the ultimate factual issues of likelihood of confusion," and 10% of possible confusion is the generally accepted standard for likelihood of confusion (or not).  D-SAMF 1-6; Sowers Rpt., n. 16, 54, 78, 80.  His report details his two surveys, but their bottom line is: (1) only *0.8%* of respondents who live or work in the Boston area could be considered likely confused; and (2) only *2.3%* of respondents who intend to visit Boston could be considered likely confused.  D-SMAF 4-8; Sowers Rpt., ¶¶ 18, 92, 104-05, 153, 165-66, 168.  Mr. Sowers and Mr. Bania also offered rebuttal to the opinions of Plaintiff's experts regarding likelihood of confusion.  D-SMAF 9-15; Bania Rpt., ¶¶ 8-12; Sowers Rpt., ¶¶ 7-12, 20-40, 167, 169.[26]  And, Plaintiff's improper sneak attack expert report (Franklyn Rpt.) (Pl. Br. at 16) only underscores that (if Defendants' co-pending motion to strike is not granted), there are dueling expert opinions and surveys; summary judgment is inappropriate.  *See, e.g., Pa. State Univ. v. Vintage Brand, LLC*, 715 F. Supp. 3d 602, 651-52 (M.D. Pa. 2024).

### 5.    There are Factual Disputes as to Intent

*Pignons* Factor #7 considers whether Inishowen—subjectively—acted in bad faith in adopting the name "The Dubliner" for Dubliner Boston.  *See, e.g., Bos. Duck Tours*, 531 F.3d at

---

[25] Plaintiff claims that several of these guests were "embarrassed."  But, it is unclear why they may have felt that way.  It is equally plausible that the embarrassment was because of their inattentiveness in making the reservation.  We will never know; as explained in Defendants' L.R. 56.1 Statement and in its accompanying motion to strike, Plaintiff's use of second (or third) hand hearsay means intentionally obscures that factual information as to what these customers said and the facts surrounding them, which makes Plaintiff's claims inadmissible.

[26] Plaintiff is not seeking to strike any these portions of the Bania Rpt., or any portion of the Sowers Rpt. Defendants separately address the portions of the Bania Rpt. that Plaintiff is seeking to strike in their opposition to Plaintiff's partial *Daubert* motion, concurrently filed herewith.

10 n.6.  "Mere knowledge of the existence of a competitor's mark is insufficient to prove bad faith."  *Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc.*, <u>828 F.Supp.2d 384, 395</u> (D. Mass. 2010).  Rather, "bad faith requires proof that one party intended to capitalize on the holder's reputation/goodwill and confusion between the marks." *Id*.

There are no undisputed facts that *Inishowen* knew about Plaintiff's Dubliner Marks. Willy McCarthy (an relatively inactive co-owner of Inishowen) was generally aware of Dubliner DC because he had a friend who had performed there many years ago.  R-SMF 27.  He never shared information with Oran McGonagle (the active co-owner of Inishowen and primary decision-maker of the name).  *Id*.

Nor is there any evidence that Inishowen (or Mr. McCarthy) was attempting to "capitalize on" Plaintiff's (alleged) reputation or goodwill and confusion between the marks. Rather, Inishowen decided to "adopt" "The Dubliner" for Dubliner Boston because, among other reasons:  (1) when Mr. McGonagle and Mr. McCarthy first toured the location, the "theme" of the previous Irish pub (named "Kinsale") was a "Dublin-style pub" and the "The Dubliner" was "hand in hand with that"; (2) opening another Dublin-style pub made sense, given the Kinsale's existing layout; (3) Mr. McCarthy is a Dubliner (from Dublin, Ireland); (4) there was previously a "Dubliner" Irish pub in Cambridge, Massachusetts and Mr. McGonagle thought he could "reopen one"; (5) Mr. McGonagle had conducted a business records search in Boston, Massachusetts and "there was no objection" to the name; (6) Mr. McGonagle did not like the only other proposed name and Mr. McCarthy agreed that Mr. McGonagle should choose the name.  *See* R-SMF 24.

Plaintiff resorts to misdirection.  Inishowen is not required to "conduct a trademark clearance search."  Mr. McGonagle took the steps that he—subjectively—thought were

18

sufficient.  R-SMF 25-36.  Dubliner Boston's refusal to change its name upon receiving

Plaintiff's cease-and-desist letter does not change anything.  R-SMF 24, 27-31; *see also* Bania

Rpt., ¶¶ 78-80.  Plaintiff's argument would mean that not capitulating whenever a party receives

a cease-and-desist letter is bad faith.  Intent is a quintessential jury question.[27]

### 6.	There are Factual Disputes as to the Strength of the Dubliner Marks

*Pignons* factor #8 evaluates the strength of Plaintiff's Dubliner Marks.  Plaintiff admits

this includes considering Dubliner DC's actions—and failures to act—in protecting its marks.

Pl. Br. at 18-19.  Even if Plaintiff adduced undisputed evidence that its Dubliner Marks were

strong (they are not), that does not relieve it of its burden as to likelihood of confusion.  *See*

*Pignons*, 657 F.2d 491.

There is substantial evidence the Dubliner Marks not strong.  In finding that Plaintiff

could not stop the use of another DUBLINER mark in connection with food, the U.S. Patent and

Trademark Office determined that the Dubliner Marks are "relatively weak," that "it is not

unusual for the term Dubliner to be associated with restaurants, bars and food…," and that "the

term 'Dubliner'…is highly suggestive of goods and restaurant services that either originate in

Ireland or have an Irish theme."  R-SMF 12.  Plaintiff has long been aware of third-party uses of

"Dubliner" in the name of ***at least 32 Irish pubs***—located throughout the U.S., including up and

down the East Coast—but failed to act against them.  *Id*.; D-SMAF 17(g), 31-47; Bania Rpt., ¶¶

82-86.[28]  Plaintiff has no explanation for its repeated, and longstanding, decisions not to seek to

---

[27] Plaintiff's citation to *Attrezzi, LLC v. Maytag Corp*, 436 F.3d 32, 37-38 (1st Cir. 2006) is unavailing. That case merely suggests that the jury instructions "permitted the jury to base its findings on 'deliberate indifference.'"  *Id*. at 43.  That is a far cry from suggesting—as Plaintiff does here—that there are undisputed facts that mandate a finding of willfulness.  Further, there is no suggestion here that Inishowen is "taking a deliberate risk on what it thought was a debatable case."  *Id*.

[28] These third party uses include Phoenix, AZ; San Francisco, CA (two); Long Beach, CA; Olympic Valley, CA; Englewood, CO; Dayville, CT; Killingly, CT; Uncasville, CT (Mohegan Sun casino); Tampa, FL; Miami, FL; Ft. Lauderdale, FL; Chicago, IL; Boston, MA (different establishment); Cambridge (MA); Lowell, MA; St. Paul, MN; Kansas City, MO; St. Louis, MO; Omaha, NE; Hoboken, NJ; New York City, NY; Poughkeepsie, NY;

enforce the Dubliner Marks.[29]  *See, e.g.*, R-SMF 12; D-SMAF 31-47.

The co-existence of other Irish pubs using DUBLINER marks throughout the U.S. "casts doubt" (at least) on the strength of the Dubliner Marks.  *See, e.g.*, *Peoples Fed. Sav. Bank v. People's Bank*, 672 F.3d 1, 15-16 (1st Cir. 2012).  This is particularly true where—as here—such third-party uses are substantial.[30]  *See, e.g.*, *Pub. Impact, LLC v. Bos. Consulting Grp., Inc.*, 169 F.Supp.3d 278, 294 (D. Mass. 2016); *Dos Gringos*, 2008 WL 11334495, at \*8.  And, to the extent Plaintiff suggests that Dubliner Whiskey's nationwide sales demonstrates the nationwide strength of its Marks, its failure to enforce its Marks against numerous of those other "Dubliners" in other states where Dubliner Whiskey is also sold *undercuts* its argument that the Dubliner Mark is strong (the presence of those other "Dubliners" would weaken it).  R-SMAF 14.

At best, Plaintiff's Dubliner Marks are only well known in connection with *a single location* (Dubliner DC).  The substantial number of other "Dubliner" Irish pubs across the country suggests that consumers understand the use of a DUBLINER mark is simply "highly suggestive of goods and restaurant services that either originate in Ireland or have an Irish theme."  R-SMF 12; D-SMAF 17(g), 31-47; Bania Rpt., ¶¶ 82-86.  Consumers also understand that different "Dubliner" Irish pubs co-exist in different geographic locations.  *Id.*

IV.    CONCLUSION

For the foregoing reasons, and for the reasons stated in Defendants' L.R. 56.1 Statement, Defendants respectfully request that the Court deny Plaintiff's motion.

---

Henderson, NV; Wilmington, NC; Cincinnati, OH; New Hope, PA; Dallas, TX; Houston, TX; Redmond, WA; Seattle, WA; and Milwaukee, WI.  R-SMF 12; D-SMAF 17(g), 31-48.

[29] Plaintiff's claim it has licensed a "The Dubliner on the Delaware" is incorrect.  R-SMF 12, 20.

[30] These uses far exceed the two in *Polar Corp. v. PepsiCo., Inc.*, 789 F. Supp. 2d 219, 235 (D. Mass 2011).

Respectfully submitted,

EAST COAST TAVERN GROUP, INC.
and INISHOWEN, INC.

By their attorneys,


 /s/ Benjamin M. Stern
Benjamin M. Stern (BBO# 646778)
bstern@nutter.com
Patrick J. Concannon (BBO# 643673)
pconcannon@nutter.com
Maya Ginga Ritchie (BBO# 705397)
mgritchie@nutter.com
Nutter McClennen & Fish, LLP
Seaport West, 155 Seaport Blvd.
Boston, MA 02210
Telephone:(617) 439-2000
Facsimile: (617) 310-9000

Dated: May 5, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of May 2025, the foregoing document will be served electronically via secure LeapFILE transfer to counsel of record for Dubliner, Inc.


/s/ Benjamin M. Stern
Benjamin M. Stern

21

7218068